STEPHEN T. COX, State Bar No. 39040
THE LAW OFFICE OF STEPHEN COX
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Tel.:    (415) 291-4575
Fax:    (415) 956-1152
    stephen@scoxlaw.com

Kevin Landau
Brett Cebulash
Miles Greaves
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel.:    (212) 931-0704
    klandau@tcllaw.com
    bcebulash@tcllaw.com
    mgreaves@tcllaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHERINE ZONIO,<br><br>        Plaintiff,<br><br>    v.<br><br>FCA US LLC and FIAT CHRYSLER<br>AUTOMOBILES N.V.,<br><br>        Defendant. | Case No. _____<br><br>**CLASS-ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Katherine Zonio ("Plaintiff") alleges the following on behalf of herself and all others similarly situated against Fiat Chrysler Automobiles N.V. and FCA US LLC (together, "Fiat Chrysler").

## NATURE OF THE CASE

1.    Plaintiff brings this class-action complaint on behalf of herself and similarly situated consumers who purchased or leased any of the over 103,000 diesel Dodge Ram and Jeep

-1-

1  Grand Cherokee vehicles sold in the United States since 2014 containing undisclosed Auxiliary

2  Emission Control Devices (the "Class Vehicles").

3      2.      The market for environmentally friendly "green" vehicles has surged in recent

4  years. Consumers are often faced with a tradeoff, however: power and fuel economy for lower

5  emissions. Fiat advertised and marketed that its EcoDeisel Dodge Ram and Jeep Cherokee

6  vehicles provided fuel economy and high performance while also reducing emissions.

7  Customers were promised that better mileage per gallon would lead to lower fuel costs,

8  balancing out the premium paid at the point of purchase.

9      3.      However, instead of manufacturing vehicles with the attributes advertised and

10  represented to customers, Fiat included eight unapproved Auxiliary Emission Control Devices

11  ("Unapproved AECDs") in the Class Vehicles: specially developed devices and software to

12  evade complying with United States emissions standards for certain models of Fiat's diesel

13  vehicles. These tools are designed to fool testing devices and conceal the fact that certain Fiat

14  models emitted nitrogen oxides ("NOx") at levels much higher than what was legally permitted

15  under normal driving conditions.

16      4.      Although investigations are ongoing, according to the United States

17  Environmental Protection Agency ("EPA") and the latest reports, the Unapproved AECDs were

18  installed in at least the following diesel models of Fiat vehicles: Model Year ("MY") 2014–2016

19  Dodge Ram 1500 with 3.0 liter engines, and MY 2014–2016 Jeep Grand Cherokee with a 3.0

20  liter engine.

21      5.      Plaintiff and Class members were induced to purchase Class Vehicles based on

22  deliberate misrepresentations and omissions by Fiat Chrysler in its advertising, public

23  statements, and marketing information. These were material factors in inducing Plaintiff and

24  Class members to purchase the Class Vehicles. Fiat Chrysler's deceptive scheme caused many

25  consumers worldwide to buy the Class Vehicles based on false claims of the vehicle's

26  characteristics. Plaintiff and Class members would not have purchased or leased the Class

27  Vehicles or would have paid much less had they known the truth about them.

28

-2-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

STEPHEN COX
ATTORNEY AT LAW

**PARTIES**

6.    Plaintiff Katherine Zonio is a citizen of New York residing in and resident of Broome County. On January 21, 2014, Plaintiff purchased her 2014 Jeep Grand Cherokee Summit 4x4 (with a 3.0-liter V6 EcoDiesel engine) in Ithaca, New York.

7.    FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is owned by holding company Fiat Chrysler Automobiles N.V. ("Fiat"), a Dutch corporation headquartered in London, United Kingdom. FCA was formed upon the acquisition of American automaker Chrysler by Fiat (through its Italian corporate predecessor, Fiat S.p.A.). FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

8.    FCA is a motor-vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA and its predecessor, Chrysler, are and were known as one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive-parts and accessories division, and SRT, its performance-automobile division.

9.    Fiat Chrysler Automobiles N.V. ("Fiat"), the corporate parent of FCA, also owns numerous European-based automotive brands in addition to FCA's American brands. Through subsidiary FCA Italy, these include Italian-based brands including Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth. Fiat also owns Ferrari and Maserati.

10.    Fiat also owns several manufacturers of automotive parts, including diesel-engine manufacturer VM Motori. VM Motori developed and manufactured the "EcoDiesel®" engines at issue in this suit. Between 2000 and 2007, as now, VM Motori shared a corporate parent with the Chrysler brand, because it was owned wholly or partly by then-Chrysler owner DaimlerChrysler AG. DaimlerChrysler sold its stake in VM Motori in 2007. By the start of 2011, 50% of VM Motori was owned by General Motors and 50% by Penske Corporation. In early 2011, Fiat

-3-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1  purchased Penske's 50% stake in VM Motori, and in October 2013, Fiat acquired the remaining

2  50% from General Motors.

3        11.    Fiat, through its subsidiary FCA, designs, manufactures, markets, distributes, and

4  sells two models of vehicle for which the EcoDiesel® option is available: the Ram 1500 and the

5  Jeep Grand Cherokee. The EcoDiesel® engine is a 3.0-liter V6 diesel engine developed by VM

6  Motori.

7        12.    Fiat Chrysler, through its various entities, designs, manufactures, markets,

8  distributes, and sells automobiles in California and multiple other locations in the U.S. and

9  worldwide. Fiat Chrysler and/or its agents designed, manufactured, and installed the EcoDiesel

10 engine systems in the Class Vehicles. Fiat Chrysler also developed and disseminated the owner's

11 manuals and warranty booklets, advertisements, and other promotional materials relating to the

12 Class Vehicles.

13       13.    Fiat Chrysler's business operations in the United States include the manufacture,

14 distribution, and sale of motor vehicles and parts through its network of independent, franchised

15 motor-vehicle dealers. Fiat Chrysler is engaged in interstate commerce in that it sells vehicles

16 through this network located in every state of the United States. The dealers act as FCA's agents

17 in selling the Class Vehicles and disseminating information about the Class Vehicles to customers

18 and potential customers.

19       14.    At all relevant times, Defendants manufactured, distributed, sold, leased, and

20 warranted the Class Vehicles under the Fiat Chrysler brand name throughout the United States.

21 Defendants also developed and disseminated the owners' manuals and warranty booklets,

22 advertisements, and other promotional materials relating to the Class Vehicles

23                        **JURISDICTION AND VENUE**

24       15.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d). The

25 matter in controversy exceeds $5,000,000 exclusive of interest and costs, and this matter is a class

26 action in which certain class members are citizens of States other than each Defendants' state of

27 citizenship. The Court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiff and the Class

28

998.575/1148043.1

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1   have brought a claim pursuant to 15 U.S.C. § 2301 *et seq*. and claims under the RICO Act, 18

2   U.S.C. § 1962. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

3          16.     This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C.

4   § 1965(b) & (d). This Court has personal jurisdiction over Defendants because they have minimum

5   contacts with the United States, this judicial district, and this State, and intentionally availed

6   themselves of the laws of the United States and this state by distributing, testing, selling, leasing,

7   and/or providing warranties for Fiat Chrysler vehicles in this State and District. At least in part

8   because of Fiat Chrysler's and Bosch's misconduct as alleged in this Complaint, Class Vehicles

9   ended up on this state's roads and in dozens of dealerships across the state.

10         17.     Venue is proper in this Court under 28 U.S.C. § 1391 because Fiat Chrysler

11  advertises, markets, leases, and sells a substantial number of automobiles in this District and has

12  dealerships in this District. Furthermore, a substantial part of the events alleged in this Complaint

13  giving rise to Plaintiff and the Class's claims, including the false and misleading advertising

14  alleged herein, occurred in, emanated from, and/or were directed from this District. Venue is also

15  proper in this Court because Fiat Chrysler and Bosch caused harm to Class members residing in

16  this District.

17                              **FACTUAL ALLEGATIONS**

18     **A. Emissions regulations:**

19         18.     The Clean Air Act was enacted in 1970 "to protect and enhance the quality of the

20  Nation's air resources so as to promote the public health and welfare and the productive capacity

21  of its population," and "to initiate and accelerate a national research and development program to

22  achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)–(2).

23         19.     The Clean Air Act has strict emissions standards for vehicles.  One of the

24  requirements of the Clean Air Act is that vehicle manufacturers certify to the EPA that their

25  products meet the requisite federal emission standards to control air pollution. To ensure that

26  every vehicle introduced into United States commerce satisfies applicable emission standards the

27  EPA administers a certification program. The EPA issues certificates of conformity ("COC")

28

-5-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
                                         Case No. 37-2016-00009221-CU-PA-CTL

1   under this standard and approves the introduction of vehicles satisfying the standards into United

2   States commerce. Certificates of conformity must be issued by the EPA for every vehicle sold in

3   the United States. Class Vehicles (light-duty motor vehicles) at issue in this Complaint must also

4   obtain the COC. Additionally, emission standards for certain air pollutants, which include nitrogen

5   oxides (NOx), must be satisfied by the Class Vehicles. 40 C.F.R. § 86.1811-04; 42 U.S.C.

6   § 7401(b)(1)–(2).

7       20.     As part of that certification process, the manufacturer must disclose any "auxiliary

8   emission control devices" ("AECDs") that are included in the vehicle. AECDs are "any element of

9   design which senses temperature, vehicle speed . . . or any other parameter for the purpose of

10  activating, modulating, delaying, or deactivating the operation of any part of the emission control

11  system." 40 CFR 86.1803-01. All vehicles have AECDs, and there is nothing per se illegal about

12  modulating the operation of emissions control systems. However, in applying for a COC, the

13  manufacturer must list all AECDs in the vehicles, and then justify why they are not "defeat

14  devices." 40 CFR 86.1844-01(d)(11).

15      21.     40 CFR 86.1803-01 provides that:

16      Defeat device means an auxiliary emission control device (AECD) that reduces
        the effectiveness of the emission control system under conditions which may

17      reasonably be expected to be encountered in normal vehicle operation and use,
        unless:

18

19      (1) Such conditions are substantially included in the Federal emission test
            procedure;

20

21      (2) The need for the AECD is justified in terms of protecting the vehicle against
            damage or accident; or

22

23      (3) The AECD does not go beyond the requirements of engine starting.

24      22.     Here, because the Class Vehicles are equipped with a defeat device and passed

25  emissions testing only by cheating, they should never have received COCs that rendered them

26  legal to sell in the U.S.

27

28

-6-

STEPHEN COX
ATTORNEY AT LAW

**B. Fiat marketed the Class Vehicles as environmentally friendly and fuel efficient.**

23.    Over the years, Fiat increased its emphasis on diesel cars and engaged in an extensive marketing campaign to sell more "clean" diesel vehicles in the United States.

24.    Fiat's EcoDiesel® vehicles are aggressively marketed as offering a combination of power, efficiency, and environmental cleanliness that competitors cannot match: the Class Vehicles' "exhaust is ultra-clean" due to their "advanced emissions-control technology." Specifically, the "emissions control system helps ensure that virtually no particulates and minimal [NOx] exit the tailpipe."

25.    The Class Vehicles are also represented to be emission-compliant in all 50 states. That claim is bolstered by the inclusion of an Emissions Warranty guaranteeing compliance with applicable emissions regulations, which Defendants placed in the owner's manuals of Class Vehicles.

26.    Since at least 2014, Fiat marketed that the Class Vehicles had EcoDiesel engines possessing unique and desirable qualities. For example, Fiat advertised, "Forget everything you thought you knew about diesel. The Jeep EcoDiesel engine offers innovative technology that is efficient, increases range and improves power—all while leaving little trace of being there."[1]



---

[1] http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/#introduction (last visited March 6, 2017).

-7-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

27.     Fiat represented Class Vehicles as offering excellent fuel economy: greater than a comparable gasoline engine and offering a range of 730 miles on a single tank of diesel fuel.[2]

28.     Fiat further claims that "the Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[3]

29.     But unbeknownst to those consumers—consumers who Fiat identified as wanting "an efficient, environmentally-friendly truck without sacrificing capability or performance"— Defendants could only achieve those impressive results by cheating on emissions testing. Moreover, in normal driving, the vehicles polluted much more than advertised or permissible by applicable laws.

**C. Defendants used a defeat device.**

30.     The EPA issued a notice of violation of the Clean Air Act, 42 U.S.C. §§ 7401—7671q, and its implementing regulations to Fiat Chrysler on January 12, 2017. According to the notice, Fiat Chrysler's light-duty diesel vehicles from 2014–2016 contained at least eight undisclosed AECDs that "appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g. FTP, US06), than in normal operation and use."[4] Among other violations, EPA asserts that "FCA violated section 203(a)(1) of the CAA [Clean Air Act], 42 U.S.C. S 7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported (or caused any of the foregoing with respect to) approximately 103,828 new motor vehicles within these test groups."[5] CARB also issued a notice of violation to Fiat Chrysler on January 12, 2017.

---

[2] http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/#range (last visited March 6, 2017).

[3] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, OBJECTS IN THE MIRROR… (May 22, 2015) (blog operated by FCA Digital Media), https://blog.fcanorthamerica. com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/ (last visited Mar. 7, 2017).

[4] EPA Notice of Violation for Model Year 2014–2016 diesel light-duty vehicles (Dodge Ram and Jeep Grand Cherokee), https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

[5] *Id.*

-8-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

31.    Defeat devices, like the one(s) used by Fiat Chrysler, cheat the emission-control systems in a vehicle that are used to comply with the Clean Air Act emission standards. The defeat devices use multiple factors in sensing whether the vehicle is being tested for compliance with EPA emission. The Class Vehicles contain at least eight undisclosed AECDs, which work to alter the performance of the vehicles when testing conditions are present. When the Class Vehicles were not being tested, the EcoDiesel vehicles polluted at levels far above the legal limits set by EPA and CARB.

32.    Fiat Chrysler's use of the defeat device caused the Class Vehicles to not conform in all material respects to the vehicle specifications described in the applications for the COCs. As a result, Fiat Chrysler violated section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing these vehicles, or for causing any of the foregoing acts.

33.    Fiat Chrysler violated the Clean Air Act by making and selling vehicles with defeat devices that cheated emissions testing and also allowed for higher levels of air emissions than they certified to EPA when not being tested.

34.    Fiat Chrysler knew that the defeat devices it designed and installed would cheat the Clean Air Act emission standards because the software was designed to track the parameters of the federal test procedure and alter the emission-control system so that it underperformed whenever the software determined the vehicle was not undergoing emissions testing.

35.    The purpose of the Clean Air Act and associated regulations is to reduce emissions of NOx and other pollutants from mobile sources of air pollution in an effort to protect human health and the environment. NOx pollution damages the environment and is a risk to human health.

36.    Defendants' fraudulent scheme was motivated by the desire to expand market share in the United States by adding diesel engines to FCA's light-truck and SUV lineup. Dodge and Ram were already well known for their heavy-duty trucks equipped with large 8-cylinder engines supplied by Cummins. Unlike in Europe, where diesel engines in economy cars and small

-9-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

commercial vehicles have long been popular, diesel engines were stigmatized in the United States. Many consumers perceived diesel engines as emitting thick smoke and dangerous pollutants, based on earlier engines of the 1980s and early 1990s. Successful as they were, Dodge and Ram Cummins-equipped heavy-duty trucks contributed to this perception in a certain way: a community of enthusiasts has grown around "rolling coal"—that is, modifying the vehicles' emissions systems to belch black clouds of smoke and particulates.

37.    However, other manufacturers—most notably, Volkswagen—had begun selling smaller, more economical vehicles in the U.S. with diesel engines as environmentally friendly, fuel-efficient alternatives to hybrids and other economical vehicles. Like Volkswagen, Fiat had considerable expertise with diesel engines in Europe, primarily through its subsidiary VM Motori, a leading supplier of diesel engines. Prior to Fiat's takeover of Chrysler, when VM Motori was controlled by DaimlerChrysler and then General Motors, VM Motori supplied diesel engines for use in Chrysler/Jeep and General Motors automobiles.

38.    The engine at issue—now known as "EcoDiesel®," a 3.0-liter, six-cylinder turbodiesel—had been under development before Fiat acquired any of VM Motori for use in a General Motors automobile for the European market.

39.    After acquiring a 50% stake in VM Motori, Defendants set about integrating a 3.0-liter, six-cylinder V.M. Motori turbodiesel engine into FCA's popular light-duty trucks and SUVs, the Ram 1500 pickup and the Jeep Grand Cherokee, purportedly offering the benefits of diesel performance and fuel economy to a market quite distinct from those who bought heavy-duty, Cummins-equipped Ram 2500 and 3500 trucks.

40.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. . . . We combined resources and developed them together."

41.    On information and belief, because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in FCA vehicles.

-10-

42.    The modern type of smaller, turbocharged, direct-injected diesel engines, like Volkswagen's "Clean Diesel" TDI and Fiat Chrysler's EcoDiesel® engines, offer several benefits that maximize the potential of diesel fuel. Turbochargers force air into the combustion chambers, aiding in achieving higher compression, enhancing the efficiency with which power is extracted from the fuel. Direct fuel injection allows a sophisticated engine-management computer to precisely manage the air–fuel mixture at all times to maximize power and efficiency.

43.    The EcoDiesel® option, however, is not cheap for environmentally conscious consumers. For example, the feature is only available on the three most expensive 2014 Grand Cherokee models and adds $4,500 to those vehicles' overall price. The EcoDiesel® option on the 2015 Ram 1500 adds between $3,120 and $4,960.

44.    It is also well documented that these pollutants are associated with serious health effects, including increased asthma attacks and other respiratory illnesses. Exposure to ozone and particulate matter that result from nitrogen dioxide, a by-product of NOx emissions, has been linked to an increased risk of heart attacks, strokes, and premature death due to respiratory-related or cardiovascular-related effects. Recent studies have shown that not only can NOx cause or exacerbate a number of health conditions, but exposure to these toxins are correlated with lower birth weight and smaller head circumference in babies.

45.    Given the dangers of NOx, technology offers a solution. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine-control module that manages the fuel-air mixture and other aspects of engine operation.

46.    The Class Vehicles use engine-management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated

-11-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1   programming that can sense and vary factors like steering, combustion, and emissions

2   performance for different driving situations.

3       47.     The computer that manages these systems in the Class Vehicles is an "electronic

4   diesel control" or "EDC." The defeat device consists of software programming on this computer

5   capable of detecting when the Class Vehicles are undergoing emissions testing through certain

6   sensor inputs that monitor vehicle speed, engine operation, steering-wheel positioning, and the

7   like. This type of defeat device has been termed a "cycle detection defeat device" because it

8   detects when a vehicle is being tested and then operates the engine and emissions controls in such

9   a way that the vehicles pass emissions testing. Because the measures required to pass emissions

10  testing resulted in some combination of traits that would be undesirable in normal operation—

11  such as greater fuel consumption, lower performance, or unsustainable consumption of the urea

12  solution used in SCR—the Defendants ensured that at all other times the Class Vehicles operated

13  in a manner that polluted many times more than the legal emissions limits.

14      48.     Plaintiff and the Class have been harmed as a result of Fiat Chrysler's actions.

15  Members of the Class would not have purchased the Class Vehicles, and/or would have paid

16  substantially less for their vehicle. The loss of value to the Class Vehicles is directly attributable to

17  Defendants' fraudulent and deceptive actions. The Class Vehicles are not worth as much in a trade

18  or sale as if the vehicle had been as warranted. The value of the Class Vehicles is furthered

19  decreased by this actual harm and also the harm to the brand.

20      49.     Plaintiff and the Class will more than likely lose the use of their vehicles as a result

21  of a recall. Moreover, in order for the vehicles to comply with federal emission standards the

22  vehicles will have reduced fuel economy and reduced acceleration during real-world use after the

23  Class Vehicles are remediated. As a result, the Plaintiff Class has sustained incidental and

24  consequential damages as herein alleged.

## CLASS ALLEGATIONS

25      50.     Plaintiff brings this action on behalf of herself and as a class action pursuant to the

26  provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of

27  the following class and subclass (collectively, the "Classes"):

28

-12-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

**The Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of a FCA "Class Vehicle." Class Vehicles include, without limitation, all FCA EcoDiesel® vehicles equipped with selective catalytic reduction ("SCR") to control NOx emissions, including but not limited to the Ram 1500 and the Jeep Grand Cherokee.

**The New York Subclass**

All persons or entities in the state of New York who are current or former owners and/or lessees of a "Class Vehicle."

51.    Excluded from the Class are individuals who have personal injury claims resulting from the "defeat device." Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his or her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

52.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of her claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

53.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

54.    ***Numerosity (Federal Rule of Civil Procedure 23(a)(1))***: The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are not less than 100,000 members of the Class, the precise number of Class members is unknown to Plaintiff, but may be ascertained from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

55.    ***Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3))***: This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including, without limitation:
    a)    whether Defendants engaged in the conduct alleged herein;

-13-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

b) whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c) whether the emissions-control system in the Class Vehicles contains a defect in that it does not comply with EPA requirements;

d) whether the emissions-control systems in Class Vehicles can be made to comply with EPA standards without substantially degrading the performance and/or efficiency of the Class Vehicles;

e) whether Defendants knew about the defeat device and, if so, how long Defendants have known;

f) whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a defeat device;

g) whether Defendants' conduct violates consumer-protection statutes, warranty laws, and other laws as asserted herein;

h) whether Plaintiff and the other Class members overpaid for their Class Vehicles;

i) whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

i) whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

j) whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

56.    *Typicality* (**Federal Rule of Civil Procedure 23(a)(3)**): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Neither Plaintiff nor the other Class members would have purchased the Class Vehicles had they known of the defects in the vehicles. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members. Plaintiff's claims are based on the same legal theories as the claims of the other Class members.

-14-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

57.    *Adequacy* **(Federal Rule of Civil Procedure 23(a)(4)):** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class-action litigation; and Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor her counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of Class members will be fairly and adequately protected.

58.    *Declaratory and Injunctive Relief* **(Federal Rule of Civil Procedure 23(b)(2)):** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members. Final injunctive and declaratory relief, as described below, is therefore appropriate with respect to the Class as a whole.

59.    *Superiority* **(Federal Rule of Civil Procedure 23(b)(3)):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

## CLAIMS FOR RELIEF

## COUNT I

### Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d) (on behalf of the Nationwide Class)

60.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

61.     Plaintiff brings this Count on behalf of the Nationwide Class.

62.     At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

63.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

64.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d). In order to compete with vehicle manufacturers like Volkswagen (which successfully introduced a line of "environmentally-friendly" diesel-engine vehicles in the United States) and increase their market share, Defendants sought to add diesel engines to their light-truck and SUV lineup. But, due to the strict emissions-control requirements imposed by U.S. law and the demands of consumers in the United States, they found it impossible to achieve their goals lawfully, and instead resorted to cheating through a fraudulent scheme and conspiracy. The illegal scheme was hatched overseas by Fiat Chrysler Automobiles N.V., brought to U.S. shores by and through the vehicles of FCA US LLC, and executed in conjunction with Fiat's subsidiary companies overseas, including VM Motori.

65.     Specifically, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of a RICO enterprise (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were compliant

-16-

STEPHEN COX
ATTORNEY AT LAW

1  with emission standards, clean, fuel efficient, and environmentally friendly so as to increase

2  revenues and minimize losses from the design, manufacture, distribution, and sale of the Class

3  Vehicles and the defeat devices installed therein. As a direct and proximate result of their

4  fraudulent scheme and common course of conduct, Defendants were able to extract revenues of

5  billions of dollars from Plaintiff and the Class. As explained in detail below, Defendants' years-

6  long misconduct violated Sections 1962(c) and (d).

7  **A. Description of the Defeat Device RICO Enterprise:**

8  66.     In an effort to expand its global reach, market share, and standardized marketing

9  and sales in the U.S., Italian automaker Fiat (then controlled by an Italian holding company)

10  acquired American automaker Chrysler. This acquisition occurred gradually over a period of

11  years, between 2009 and 2014 and resulted in the creation of FCA US LLC. All Fiat assets,

12  including both FCA US and FCA Italy and their respective subsidiaries, were later merged into

13  Fiat Chrysler Automobiles N.V., a new Dutch holding company, in 2014. At all relevant times,

14  Defendants maintained tight control over the design, manufacture, and testing of the Class

15  Vehicles. Their business operations in the United States include, for example, the manufacture,

16  distribution, and sale of motor vehicles and parts through their network of independent, franchised

17  motor-vehicle dealers.

18  67.     At all relevant times, Defendants, along with other individuals and entities,

19  including unknown or additional third parties involved in the design, manufacture, testing, and

20  sale of the Class Vehicles, operated an association-in-fact enterprise, which was formed for the

21  purpose of fraudulently obtaining certificates of compliance from the EPA (and executive orders

22  from CARB) in order to sell Class Vehicles containing defeat device(s) throughout the U.S., and

23  through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

24  68.     Specifically, Fiat Chrysler Automobiles N.V. and/or FCA US LLC are the entities

25  that applied for, and obtained, the EPA certificates of compliance for the Fiat–Chrysler-branded

26  Class Vehicles with material misrepresentations and omissions about their specifications in order

27  to introduce them into the U.S. stream of commerce.

28

-17-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

69.    Defendants used their network of independent, franchised motor-vehicle dealers to distribute and sell the illegal Class Vehicles throughout the U.S.

70.    VM Motori participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, testing, and/or supplying V6 diesel engines which contained and concealed unlawful defeat device(s) to Defendants.

71.    VM Motori began development of this engine before its acquisition by Fiat.[6]  Fiat acquired half of VM Motori in 2011, and completed its acquisition only in late 2013, after the engine and the Class Vehicles had been developed, certified by the EPA, and put on sale in the United States.[7]

72.    The separate legal statuses of Defendants and VM Motori facilitated the fraudulent scheme and attempted to provide a shield from liability for Defendants and their co-conspirators.

73.    Alternatively, Defendants, their subsidiaries, and their directors, officers, and engineers constitute a single "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity in the U.S. The enterprises, alleged in this and the previous paragraphs, are referred to collectively as the "Defeat Device RICO Enterprise."

74.    At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

75.    The association-in-fact Defeat Device RICO Enterprise consisted of the following entities and individuals:

---

[6] Manoli Katakis, *Fiat-Chrysler 3.0L Diesel V6 Was Originally a GM Engine*, GM AUTHORITY, (July 16, 2013), http://gmauthority.com/blog/2013/07/fiat-chrysler-3-0l-diesel-v6-is-actually-a-gm-engine/ (last visited Mar. 7, 2017).

[7] Larry P, Vellequette, *Fiat Buys Remainder of Diesel Manufacturer VM Motori From GM*, AUTOMOTIVE NEWS (Oct. 28, 2103), www.autonews.com/article/20131028/OEM 10/131029887/fiat-buys-remainder-of-diesel-maker-vm-motori-from-gm (last visited Mar. 7, 2017).

-18-

**1.    The Fiat–Chrysler Entity Defendants:**

76.    Fiat Chrysler Automobiles N.V. and its American subsidiary FCA US LLC, working with the other below-described members of the Defeat Device RICO Enterprise, devised a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating a defeat device into the Class Vehicles' engine-management computers.

77.    Employing this technology, Defendants fraudulently obtained certificates of compliance (and executive orders) for the Class Vehicles, even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions

78.    Moreover, to profit from the scheme and increase their sales, Defendants falsely marketed the Class Vehicles as not only compliant but clean, fuel-efficient, and environmentally friendly vehicles.

**2.    VM Motori:**

79.    VM Motori S.p.A. ("VM Motori") is a diesel-engine manufacturer based in Cento, Italy. In 2011, Fiat purchased a 50% share of the company from Penske Corporation. General Motors controlled the other 50%. Fiat bought the remaining 50% from General Motors in late 2013, after the Class Vehicles and engines had already been developed, certified by the EPA, and offered for sale in the United States.

80.    Back in 2010 or 2011, VM Motori announced a new product line of a V6, 3.0L displacement engines for inclusion in SUVs, trucks, and large sedans. These engines had been under development for use in a General Motors automobile for the European market.[8]

81.    However, further development for use in FCA vehicles took place following Fiat's acquisition of 50% of VM Motori in 2011. As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. . . . We combined resources and developed them together."[9]

---

[8] *An Inside Look at the Ram 1500 3.0L EcoDiesel*, ENGINE LABS (Mar. 7, 2017), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/ (last accessed Mar. 7, 2017).

[9] *Id.*

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

82.    According to their website, VM Motori is deeply involved in the development of testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine-to-machine coupling up to the production."[10]

83.    In fact, VM Motori makes specific mention of their involvement in "[c]alibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.),"[11] and notes that their facilities include "[r]olling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[12]

84.    During all relevant periods, VM Motori developed and supplied engines for the Class Vehicles which contained, were calibrated to, or suppressed the existence of a defeat device, in furtherance of the Defeat Device RICO Enterprise.

**B.    The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

85.    Because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in FCA vehicles.

86.    At all relevant times, the Defeat Device RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants; their subsidiaries, officers, executives, and engineers; VM Motori; and other entities and individuals associated for the common purpose of

---

[10] VM Motori, *Research and Development*, http://www.vmmotori.com/r-s/vm-motori/r-s-2.html (last visited Mar. 7, 2017).

[11] *Id.*

[12] *Id.*

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

STEPHEN COX
ATTORNEY AT LAW

designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiff and the Nationwide Class through fraudulent certificates of compliance and executive orders, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the Defeat Device RICO Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.

87.     The Defeat Device RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

88.     The Defeat Device RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

89.     Within the Defeat Device RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Defeat Device RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

90.     Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Defeat Device RICO Enterprise, Defendants functioned as a unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

91.     Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein. While Defendants participated in,

-21-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1    and are members of, the enterprise, they had and have a separate existence from the enterprise,

2    including distinct legal statuses, different offices and roles, bank accounts, officers, directors,

3    employees, individual personhood, reporting requirements, and financial statements.

4    92.    Defendants exerted substantial control over the Defeat Device RICO Enterprise,

5    and participated in the affairs of the Defeat Device RICO Enterprise by:

   a.    designing the Class Vehicles with defeat devices;

   b.    failing to correct or disable the defeat devices;

   c.    manufacturing, distributing, and selling the Class Vehicles that emitted greater
         pollution than allowable under the applicable regulations;

   d.    misrepresenting and omitting (or causing such misrepresentations and omissions to
         be made) vehicle specifications on certificate-of-compliance and executive-order
         applications;

   e.    introducing the Class Vehicles into the stream of U.S. commerce without a valid
         EPA certificate of compliance and/or CARB executive order;

   f.    concealing the existence of the defeat devices and the unlawfully high emissions
         from regulators and the public;

   g.    misleading the driving public as to the nature of the defeat devices and the defects
         in the Class Vehicles;

   h.    designing and distributing marketing materials that misrepresented and concealed
         the defect in the vehicles;

   i.    otherwise misrepresenting or concealing the defective nature of the Class Vehicles
         from the public and regulators;

   j.    illegally selling and/or distributing the Class Vehicles;

   k.    collecting revenues and profits from the sale of such products; and

   l.    ensuring that the other RICO Defendants and unnamed co-conspirators complied
         with the fraudulent scheme.

22    93.    Defendants directed and controlled the ongoing organization necessary to

23    implement the scheme at meetings and through communications of which Plaintiff cannot fully

24    know at present because such information lies in the Defendants' and others' hands.

25    **C. Mail and wire fraud:**

26    94.    To carry out, or attempt to carry out the scheme to defraud, Defendants, each of

27    whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly

28

-22-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device

RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C.

§§ 1961(1), 1961(5), and 1962(c), and which employed the use of the mail and wire facilities, in

violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

95.    Specifically, Defendants have committed, conspired to commit, and/or aided and

abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of

18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity

which Defendants committed, or aided or abetted in the commission of, were related to each other,

posed a threat of continued racketeering activity, and therefore constitute a "pattern of

racketeering activity." The racketeering activity was made possible by Defendants' regular use of

the facilities, services, distribution channels, and employees of the Defeat Device RICO

Enterprise. Defendants participated in the scheme to defraud by using mail, telephone, and the

Internet to transmit mailings and wires in interstate or foreign commerce.

96.    Defendants used, directed the use of, and/or caused to be used, thousands of

interstate mail and wire communications in service of their scheme through virtually uniform

misrepresentations, concealments, and material omissions.

97.    In devising and executing the illegal scheme, Defendants devised and knowingly

carried out a material scheme and/or artifice to defraud Plaintiff and the Nationwide Class or to

obtain money from Plaintiff and the Nationwide Class by means of materially false or fraudulent

pretenses, representations, promises, or omissions of material facts. For the purpose of executing

the illegal scheme, Defendants committed these racketeering acts, which number in the thousands,

intentionally and knowingly with the specific intent to advance the illegal scheme.

98.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are

not limited to:

> Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by
> causing to be sent and/or received, materials via U.S. mail or commercial interstate
> carriers for the purpose of executing the unlawful scheme to design, manufacture,
> market, and sell the Class Vehicles by means of false pretenses, misrepresentations,
> promises, and omissions.

-23-

Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

99.    Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a.   the Class Vehicles themselves;

b.   component parts for the defeat devices;

c.   essential hardware for the Class Vehicles;

d.   falsified emission tests;

e.   fraudulent applications for EPA certificates of compliance and CARB executive orders;

f.   fraudulently obtained EPA certificates of compliance and CARB executive orders;

g.   vehicle registrations and plates as a result of the fraudulently obtained EPA certificates of compliance and CARB executive orders;

h.   documents and communications that facilitated the falsified emission tests;

i.   false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j.   sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

k.   documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports, and correspondence;

l.   documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

m.  payments to VM Motori;

n.   millions of dollars in compensation to Fiat and FCA executives;

o.   deposits of proceeds; and

p.   other documents and things, including electronic communications.

100.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Defendants made

-24-

misrepresentations about the Class Vehicles on their websites, YouTube,[13] and through

advertisements online, all of which were intended to mislead regulators and the public about the

fuel efficiency, emissions standards, and other performance metrics.

101.    For example, as pictured below, Defendants announced that the EcoDiesel® engine

installed in the Jeep Grand Cherokee is "efficient" and environmentally friendly: "leaving little

trace of being there."



102.    Defendants also communicated by U.S. mail, by interstate facsimile, and by

interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and

other third-party entities in furtherance of the scheme

103.    The mail and wire transmissions described herein were made in furtherance of

Defendants' scheme and common course of conduct to deceive regulators and consumers and to

lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly

disregarded as emitting illegal amounts of pollution, despite their advertising campaign.

104.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire

facilities have been deliberately hidden and cannot be alleged without access to Defendants' books

and records. However, Plaintiff has described the types of, and in some instances, occasions on

---

[13] *See, e.g.*, Jeep, *2014 Grand Cherokee – 3.0L EcoDiesel® Engine* (last accessed
1/13/17), https://www.youtube.com/watch?v=TMJYIyiBkZk.

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1  which the predicate acts of mail and/or wire fraud occurred. They include thousands of

2  communications to perpetuate and maintain the scheme, including the things and documents

3  described in the preceding paragraphs.

4    105.    Defendants have not undertaken the practices described herein in isolation, but as

5  part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants

6  conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and

7  corporations, including third-party entities and individuals not named as defendants in this

8  Complaint, have participated as co-conspirators with Defendants in these offenses and have

9  performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market

10  share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout

11  the illegal scheme and common course of conduct.

12    106.    Defendants aided and abetted others in the violations of the above laws, thereby

13  rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

14    107.    To achieve their common goals, Defendants hid from the general public the

15  unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the

16  defect.

17    108.    Defendants and each member of the conspiracy, with knowledge and intent, have

18  agreed to the overall objectives of the conspiracy and participated in the common course of

19  conduct to commit acts of fraud and indecency in designing, manufacturing, distributing,

20  marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

21    109.    Indeed, for the conspiracy to succeed each Defendant and their co-conspirators had

22  to agree to implement and use the similar devices and fraudulent tactics—specifically, complete

23  secrecy about the defeat devices in the Class Vehicles.

24    110.    Defendants knew and intended that government regulators, as well as Plaintiff and

25  Class members, would rely on the material misrepresentations and omissions made by them about

26  the Class Vehicles. Defendants knew and intended that consumers would incur costs as a result.

27  As fully alleged herein, Plaintiff, along with hundreds of thousands of other consumers, relied

28

-26-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1  upon Defendants' representations and omissions that were made or caused by them. Plaintiff's

2  reliance is made obvious by the fact that she purchased an illegal vehicle that never should have

3  been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other

4  regulators relied on the misrepresentations and material omissions made or caused to be made by

5  Defendants.

6      111.    As described herein, Defendants engaged in a pattern of related and continuous

7  predicate acts for years. The predicate acts constituted a variety of unlawful activities, each

8  conducted with the common purpose of obtaining significant monies and revenues from Plaintiff

9  and Class members based on their misrepresentations and omissions, while providing Class

10  Vehicles that were worth significantly less than the purchase price paid. The predicate acts also

11  had the same or similar results, participants, victims, and methods of commission. The predicate

12  acts were related and not isolated events.

13      112.    The predicate acts all had the purpose of generating significant revenue and profits

14  for Defendants at the expense of Plaintiff and Class members. The predicate acts were committed

15  or caused to be committed by Defendants through their participation in the Defeat Device RICO

16  Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved

17  obtaining Plaintiff's and Class members' funds and avoiding the expenses associated with

18  remediating the Class Vehicles.

19      113.    During the design, manufacture, testing, marketing, and sale of the Class Vehicles,

20  Defendants shared technical, marketing, and financial information that revealed the existence of

21  the defeat devices contained therein. Nevertheless, Defendants shared and disseminated

22  information that deliberately misrepresented the Class Vehicles as legal, clean, environmentally

23  friendly, and fuel efficient.

24      114.    By reason of, and as a result of the conduct of Defendants, and in particular, their

25  pattern of racketeering activity, Plaintiff and Class members have been injured in their business

26  and/or property in multiple ways, including but not limited to:

27      a.    purchase or lease of an illegal, defective Class Vehicle;

28      b.    overpayment for a Class Vehicle;

-27-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
                                    Case No. 37-2016-00009221-CU-PA-CTL

c.   the value of the Class Vehicles has diminished, thus reducing their resale value;

d.   other out-of-pocket and loss-of-use expenses;

e.   payment for alternative transportation; and

f.   loss of employment due to lack of transportation.

115.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### Violation of New York's GBL § 349 (Deceptive Acts and Practices) (on behalf of the New York Class)

116.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein. Plaintiff brings this claim on behalf of herself and the New York Class.

117.    Defendants' sale, through its approved dealers, of the Class Vehicles in New York constituted the "conduct of any trade or commerce" in New York within the meaning of NYS GBL § 349.

118.    Defendants' conduct—the manufacturing of automobiles containing concealed defeat devices, for sale to the public—was consumer oriented.

119.    Defendants' sale of the Class Vehicles, while intentionally concealing the defeat device from regulators and the public, was materially misleading. A reasonable consumer's decision regarding whether or not to purchase a Class Vehicle would be affected by knowledge that those models included defeat devices and did not comply with EPA emissions regulations. A reasonable consumer's decision would also be influenced by knowledge that the performance of their vehicles was only made possible by Defendants' utilization of an illegal defeat device, without which that performance would suffer (less fuel efficiency; less power; etc.).

120.    As a result of Defendants' misconduct, Plaintiff and the New York Class paid an inflated price for Class Vehicles—based on the premium attributed to the cars' ability to meet

-28-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1  environmental standards while maintaining the advantages of a diesel engine—and were thus

2  injured.

3      121.    Defendants willfully designed its cars to evade EPA emission tests and willfully

4  concealed this fact from the public.

5      122.    Plaintiff and the Class are entitled to all just and proper remedies under the law

6  including, but not limited to, actual damages or statutory damages (whichever is greater), treble

7  damages, and punitive damages, to the extent they are applicable. Section 349 allows for

8  reasonable attorney's fees and costs as well as equitable injunctive relief.

9                               <u>**COUNT III**</u>

10         **Violation of New York's GBL § 350 (False Advertising)**
11              **(on behalf of the New York Class)**

12      123.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

13  set forth herein. Plaintiff brings this claim on behalf of herself and the New York Class.

14      124.    Defendants' conduct—the advertising of the Class Vehicles on the internet and

15  television—had an impact on consumers at large.

16      125.    Defendants' various advertisements for its Class Vehicles, as detailed above, were

17  materially misleading: they falsely claimed that these vehicles were both environmentally friendly

18  and capable of maintaining the performance characteristics of a diesel engine. A reasonable

19  consumer's decision regarding whether or not to purchase a Class Vehicle would be affected by

20  knowledge that those models were neither clean nor capable of providing consumers with the

21  advantages of a diesel engine.

22      126.    Plaintiff reviewed and relied on Defendants' false advertisements detailed above.

23      127.    As a result of Defendants' misconduct, Plaintiff and the New York Class paid an

24  inflated price for Class Vehicles—based on the premium attributed to the cars' ability to meet

25  environmental standards while maintaining the advantages of a diesel engine—and were thus

26  injured.

27

28

-29-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

128.    Defendants' false advertisements were intentional: Defendants knew of the existence of the defeat devices but nevertheless touted the cleanliness and performance of the Class Vehicles.

129.    Plaintiff and the Class are entitled to all just and proper remedies under the law including, but not limited to, actual damages or statutory damages (whichever is greater), treble damages, and punitive damages, to the extent they are applicable. Section 349 allows for reasonable attorney's fees and costs as well as equitable injunctive relief.

## COUNT IV

### Fraud
### (on behalf of all Classes)

130.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

131.    Defendants' concealment of the defeat device; its representations (whether explicit or implied) that the Class Vehicles meet EPA standards; and its insistence that the Class Vehicles were able to meet EPA standards while retaining the advantages of a diesel engine were material misrepresentations or omissions of fact that Defendants—who intentionally installed the defeat devices and concealed their existence from regulators and the public—knew to be false.

132.    Defendants made these material misrepresentations and omissions—which inflated the value and desirability of the Class Vehicles—for the purpose of inducing consumers to purchase the Class Vehicles.

133.    As one of the largest and most well-established automakers in the world, Plaintiff and the Class justifiably relied on Defendants' misrepresentations regarding the quality and characteristics of the Class Vehicles.

134.    Plaintiff viewed advertisements which were disseminated by Defendants with regard to Class Vehicles before deciding to purchase her vehicle.

135.    Defendants' fraudulent intent is evidenced by the fact that they purposefully installed defeat devices in the Class Vehicles but concealed this fact from regulators in the public,

-30-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

which allowed them to evade state and federal emission tests, and advertised the Class Vehicles as both high performing and environmentally friendly despite knowledge of the defeat devices.

136.    As a result of Defendants' fraud, Plaintiff and the Class were induced into purchasing the Class Vehicles at premium-inflated prices, and were thus injured.

<u>COUNT V</u>
**Fraudulent Concealment/Intentional Misrepresentation**
**(on behalf of all Classes)**

137.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

138.    Defendants' concealment of the defeat device; its representations (whether explicit or implied) that the Class Vehicles meet EPA standards; and its insistence that the Class Vehicles were able to meet EPA standards while retaining the advantages of a diesel engine were material misrepresentations or omissions of fact that Defendants—who intentionally installed the defeat devices and concealed their existence from regulators and the public—knew to be false.

139.    Defendants made these material misrepresentations and omissions—which inflated the value and desirability of the Class Vehicles—for the purpose of inducing consumers to purchase the Class Vehicles.

140.    As one of the largest and most well-established automakers in the world, Plaintiff and the Class justifiably relied on Defendants' misrepresentations regarding the quality and characteristics of the Class Vehicles.

141.    Plaintiff viewed advertisements which were disseminated by Defendants with regard to Class Vehicles before deciding to purchase her vehicle.

142.    Defendants' fraudulent intent is evidenced by the fact that they purposefully installed defeat devices in the Class Vehicles but concealed this fact from regulators in the public, which allowed them to evade state and federal emission tests, and advertised the Class Vehicles as both high-performing and environmentally friendly despite knowledge of the defeat devices.

143.    As a result of Defendants' fraud, Plaintiff and the Class were induced into purchasing the Class Vehicles at premium-inflated prices, and were thus injured.

-31-

144.    Defendants had the duty to disclose this feature to the EPA, and by extension and implication to the public. Moreover, Defendants had a duty to disclose this information to the public because Defendants were in a vastly superior position of knowledge about the nature of the Class Vehicles.

## COUNT VI

### Fraud in the Inducement
### (on behalf of all Classes)

145.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

146.    As alleged above, Defendants made a number of materially false representations as set forth herein with an intent to defraud; Plaintiff reasonably relied upon these representations; and Plaintiff suffered damages as a result of these representations.

147.    More specifically, as a result of Defendants' representations regarding the performance and environmental attributes of its EcoDiesel line, and its concealment of the defeat device, Plaintiff was induced into entering into a contract for the purchase of her 2014 Jeep Grand Cherokee Summit 4x4 (with a 3.0-liter V6 EcoDiesel engine) at prices that she would not have otherwise paid.

## COUNT VII

### Breach of Contract
### (on behalf of all Classes)

148.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

149.    Each and every sale or lease of a Class Vehicle constitutes a contract between Defendants or their agents (licensed dealers), and the purchaser or lessee.

150.    Plaintiff performed under the contract insofar as she paid the contractually required amounts for her car.

-32-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

151.    Defendants breached these contracts by selling or leasing Plaintiff and the other Class members Class Vehicles, which were incapable of meeting the performance standards described by Defendants while also complying with governmental pollution controls. Defendants also breached their contracts by misrepresenting or failing to disclose the existence of the "defeat device," including information known to Defendants rendering each Class Vehicle less environmentally safe, emissions compliant, and fuel efficient, and thus less valuable, than vehicles not equipped with defeat devices.

152.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory, incidental, and consequential damages, as well as any other damages allowed by law.

## COUNT VIII

### Negligent Misrepresentation
### (on behalf of all Classes)

153.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

154.    As the manufacturer of the Class Vehicles, Defendants possessed a unique expertise with respect to those Vehicles (particularly with regard to whether they were or were not capable of performing as advertised while also meeting emissions standards); as a purchaser of those Vehicles, Plaintiff stood in a special relationship of trust with Defendants; and Defendants were aware that their public statements and advertisements regarding the environmental and performance characteristics of its EcoDiesel line would be relied upon by purchasers of their automobiles.

155.    Defendants made false representations, described above, regarding its vehicles' environmental and performance attributes, and Defendants should have known that these representations were incorrect.

-33-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1    156.    Defendants knew that these representations were desired by Plaintiff and the Class

2  for the purpose of deciding upon which automobile to buy.

3    157.    Plaintiff relied on Defendants' representations.

4    158.    This reliance was reasonable.

5    159.    Plaintiff and the Class were damaged by this reliance insofar as they purchased

6  vehicles that did not meet the EPA's standards and were incapable of doing so without degrading

7  their performance.

8                              **COUNT IX**

9       **Breach of an Implied Warranty of Merchantability, N.Y. U.C.C. Law § 2-314**
                          **(on behalf of the New York Class)**

10

11    160.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

12  fully set forth herein.

13    161.    Defendants are and were at all relevant times "merchants," "seller[s]," and/or

14  "lessors" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1), § 2-103(1)(d), and

15  § 2A-103(1)(p), respectively. Defendants held themselves out as having knowledge or skill

16  peculiar to the sale and manufacture of automobiles.  The vehicles at issue were at all relevant

17  times "goods" within meaning of N.Y. U.C.C. Law § 2-105(1), § 2-103(1)(h).

18    162.    Defendants were on notice that the Class Vehicles violated their implied

19  warranties; namely, that they were incapable of meeting both environmental and claimed-

20  performance standards.  Notice of the breach would have also been unnecessary because

21  Defendants cannot bring them into compliance without degrading performance, so there are no

22  repairs capable of curing Defendants' breach.

23    163.    Plaintiff purchased her car from Defendants' authorized dealers; i.e., sales or

24  leasing agent. Plaintiff was thus in privity with Defendants, or the lack-of-privity defense does not

25  apply.

26    164.    Under N.Y. U.C.C. Law § 2-314, Defendants' Class Vehicles were not

27  merchantable—i.e., they are not fit for the intended purpose for which they are used and would

28

-34-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
                                    Case No. 37-2016-00009221-CU-PA-CTL

STEPHEN COX
ATTORNEY AT LAW

not pass without objection in the trade—insofar as, because they do not meet the EPA's emission standards, they cannot be driven in the United States without being recalled and redesigned. Moreover, assuming the cars are redesigned, they will no longer possess the enhanced performance characteristics typical of a diesel engine.

165.    As a result of Defendants' breach, Plaintiff and the New York class are entitled to damages in the amount of the difference between the amount paid for the Class Vehicles and their actual value. N.Y. U.C.C. Law § 2-714(2).  Plaintiff is also entitled to incidental and consequential damages associated—for example—with any recall of the Class Vehicles, such as the costs of finding alternative means of transportation while any recall is effectuated. N.Y. U.C.C. Law § 2-715.

## COUNT X

### Breach of an Express Warranty, N.Y. U.C.C. Law § 2-313
### (on behalf of the New York Class)

166.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

167.    Defendants are and were at all relevant times "merchants," "seller[s]," and/or "lessors" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1), § 2-103(1)(d), and § 2A-103(1)(p), respectively. Defendants held themselves out as having knowledge or skill peculiar to the sale and manufacture of automobiles. The vehicles at issue were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law § 2-105(1), § 2-103(1)(h).

168.    Defendants were on notice that the Class Vehicles were in breach of their express warranties; namely, that the vehicles were incapable of meeting both environmental and claimed-performance standards, even if Defendants had not intentionally installed the defeat devices in the Class Vehicles (they did). Defendants cannot bring the vehicles into compliance without degrading performance, so there are no repairs capable of curing Defendants' breach.

169.    Defendants' statements regarding the Class Vehicles' performance and emissions characteristics were disseminated to Plaintiff and the New York Class via public advertisements and sales literature.

-35-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

170.    Defendants' statements that the Class Vehicles could maintain the advantages of a diesel engine while meeting environmental standards were affirmations of fact and descriptions of the Class Vehicles that formed part of the basis of the bargain that Plaintiff entered into.

171.    As a result of Defendants' breach, Plaintiff and the New York class are entitled to damages in the amount of the difference between the amount paid for the Class Vehicles and their actual value. N.Y. U.C.C. Law § 2-714(2). Plaintiff is also entitled to incidental and consequential damages associated—for example—with any recall of the Class Vehicles, such as the costs of finding alternative means of transportation while any recall is effectuated. N.Y. U.C.C. Law § 2-715.

## COUNT XI

**Violation of the Magnuson-Moss Consumer Warranty Act, 15 U.S.C. §§ 2301 *et seq.***
**(on behalf of all Classes)**

172.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

173.    Defendants provided Plaintiff and Class members with express and implied warranties of merchantability in connection with the purchase or lease of their vehicles within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). Defendants warranted that the Class Vehicles were environmentally friendly and fit for their ordinary purpose as passenger motor vehicles; would pass without objection in the trade as designed, manufactured, and marketed; and were adequately contained, packaged, and labeled.

174.    Defendants breached these warranties, as described in more detail above, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common defects in that they are equipped with defeat devices. A recall of the Class Vehicles will not be able to completely solve the breach insofar as, even if the vehicles are brought into EPA compliance, they will no longer be able to perform as warrantied.

175.    In their capacity as warrantors, Defendants had knowledge of the inherent defects in the Class Vehicles, and any efforts to limit the implied warranties in a manner that would exclude

-36-

1  coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise

2  limit, liability for the Class Vehicles is null and void.

3  176.  Any limitations on the warranties are procedurally unconscionable. There was

4  unequal bargaining power between Defendants and Plaintiff and the other Class members, as, at

5  the time of purchase and lease, Plaintiff and the other Class members had no other options for

6  purchasing warranty coverage other than directly from Defendants.

7  177.  The limitations on the warranties are substantively unconscionable. Defendants

8  knew that the Class Vehicles were defective. Defendants failed to disclose these defects to

9  Plaintiff and the Class members. Thus, Defendants' enforcement of the durational limitations on

10  those warranties shocks the conscience.

11  178.  Plaintiff and Class members have had sufficient direct dealings with Defendants or

12  their agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here

13  because Plaintiff and Class members are intended third-party beneficiaries of contracts between

14  Defendants and their dealers, and specifically, of the implied warranties. The dealers were not

15  intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty

16  agreements provided with the Class Vehicles; the warranty agreements were designed for and

17  intended to benefit consumers.

18  179.  Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is

19  not required to give Defendants notice and an opportunity to cure until such time as the Court

20  determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil

21  Procedure.

22  180.  Furthermore, affording Defendants an opportunity to cure their breach of written

23  warranties would be unnecessary and futile here. At the time of sale or lease of each Class

24  Vehicle, Defendants knew, should have known, or were reckless in not knowing, of the

25  misrepresentations concerning the Class Vehicles' inability to perform as warranted, but

26  nonetheless failed to rectify the situation and/or disclose the defective design. Under the

27  circumstances, the remedies available under any informal settlement procedure would be

28

-37-

CLASS-ACTION COMPLAINT / DEMAND FOR JURY TRIAL
Case No. 37-2016-00009221-CU-PA-CTL

1   inadequate and any requirement that Plaintiff resorts to an informal dispute-resolution procedure

2   and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and

3   thereby deemed satisfied.

4       181.    Plaintiff and Class members would suffer economic hardship if they returned their

5   Class Vehicles but did not receive the return of all payments made by them. Because Defendants

6   have no available cure, Plaintiff and Class members have not re-accepted their Vehicles by

7   retaining them.

8       182.    Pursuant to 15 U.S.C. § 2310(d)(3), the amount in controversy of Plaintiff's and

9   each Class member's individual claims exceeds the sum of $25. The total amount in controversy in

10  this Class action exceeds the sum of $50,000, exclusive of interest and costs, computed on the

11  basis of all claims to be determined in this lawsuit. The size of each Plaintiff Class or subclass far

12  exceeds 100 members but the precise number of class members is entirely within the Defendants'

13  knowledge and control. Plaintiff, individually and on behalf of the other Class members, seeks all

14  damages permitted by law, including diminution in value of their vehicles, in an amount to be

15  proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and Class members are

16  entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys'

17  fees based on actual time expended) determined by the Court to have reasonably been incurred by

18  Plaintiff and Class members in connection with the commencement and prosecution of this action.

19      183.    Further, Plaintiff and the Class are entitled to equitable relief under 15 U.S.C.

20  § 2310(d)(1). Based on Defendants' continuing failures to fix the known defects, Plaintiff seeks a

21  declaration that Defendants have not adequately implemented their requirements and general

22  commitments to fix their failed processes, and injunctive relief in the form of judicial supervision

23  over any recall process is warranted. Plaintiff also seeks the establishment of a Defendants-funded

24  program for Plaintiff and Class members to recover out-of-pocket costs incurred.

25      184.    Plaintiff also requests, as a form of equitable monetary relief, re-payment of the

26  out-of-pocket expenses and costs she has incurred in attempting to rectify the defects. Such

27  expenses and losses will continue as Plaintiff and Class members must take time off from work

28

-38-

STEPHEN COX
ATTORNEY AT LAW

1   and pay for rental cars or other transportation arrangements and expenses involved in going

2   through any recall process.

3       185.    The right of Class members to recover these expenses as an equitable matter, to put

4   them in the place they would have been but for Defendants' conduct, presents common questions

5   of law. Equity and fairness require the establishment by Court decree and administration under

6   Court supervision of a program funded by Defendants using transparent, consistent, and reasonable

7   protocols, under which such claims can be made and paid.

8                                   **COUNT XII**

9                              **Unjust Enrichment**
                            **(on behalf of all Classes)**

10

11      186.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

12  fully set forth herein.

13      187.    Defendants have been unjustly enriched as a result of their wrongful conduct.

14  Defendants have unjustly benefited from the sale of the Class Vehicles, the prices of which have

15  been inflated by the higher-performance and environmental-safety premiums described above.

16      188.    Defendants have been benefited at the expense of Plaintiff and the Class, who have

17  purchased the Class Vehicles.

18      189.    Because Defendants were only able to charge inflated prices for the Class Vehicles

19  by intentionally concealing its implementation of a defeat device, equity and good conscience

20  require that Defendants restore those benefits to Plaintiff and the Class. Accordingly, Plaintiff and

21  the Class seek full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as

22  a result of its wrongful conduct alleged herein.

23                              **PRAYER FOR RELIEF**

24  Plaintiff, individually and on behalf of the Class members, prays for an Order:

25      a)  determining this action may proceed as a class action under Rule 23 of the Federal
            Rules of Civil Procedure;

26

27      b)  designating Plaintiff as the Class representative;

28      c)  designating Plaintiff's counsel as counsel for the Class;

                                    -39-

d)  issuing proper notice to the Class at Defendants' expense;

e)  awarding restitution and disgorgement of Defendants' revenues obtained by means of any wrongful act or practice to Plaintiff and the Class;

f)  awarding actual, statutory, and punitive damages and interest to Plaintiff and the Class;

g)  awarding reasonable attorneys' fees, costs, and expenses to the full extent the law permits to Plaintiff and the Class; and

h)  for all other and further relief this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

DATED:  March 15, 2017                              Respectfully submitted,

                                                   /s/ *Stephen T. Cox*
                                                   Stephen T. Cox
                                                   LAW OFFICES OF STEPHEN COX
                                                   One Embarcadero Center, Suite 800
                                                   San Francisco, CA  94111
                                                   Tel.: (415) 291-457
                                                   stephen@scoxlaw.com

                                                   Kevin Landau
                                                   Brett Cebulash
                                                   Miles Greaves
                                                   TAUS, CEBULASH & LANDAU, LLP
                                                   80 Maiden Lane, Suite 1204
                                                   New York, NY 10038
                                                   Tel.: (212) 931-0704
                                                   klandau@tcllaw.com
                                                   bcebulash@tcllaw.com
                                                   mgreaves@tcllaw.com

                                                   *Attorneys for Plaintiff*



-40-